In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3211

GEORGE R. AMBATI and
PRANAYKUMAR AMBATI,

Petitioners,

v.

JANET RENO, Attorney General, and
IMMIGRATION AND NATURALIZATION SERVICE,

Respondents.

Petition for Review of an Order
of the Board of Immigration Appeals
A72 778 728/726

SUBMITTED AUGUST 9, 2000--DECIDED DECEMBER 7, 2000

Before POSNER, RIPPLE and WILLIAMS, Circuit Judges.

RIPPLE, Circuit Judge.  George Reddy Ambati and his son, Pranaykumar Ambati ("Pranaykumar"), practicing Christians and natives and citizens of India, seek review of the decision of the Board of Immigration Appeals ("BIA") dismissing their appeals. The Ambatis contend that the BIA lacked substantial evidence for its determination that Mr. Ambati failed to demonstrate either past persecution or fear of future persecution on account of his religion. They further contend that the BIA erred in upholding the Immigration Judge's ("IJ") denial of their request for a continuance to allow their attorney time to prepare their case. They also challenge the Board's conclusion that Pranaykumar's appeal was untimely. For the reasons set forth in the following opinion, we affirm.

I
BACKGROUND

The Ambatis are practicing Christians of the Roman Catholic faith. Both Mr. Ambati and his wife come from Christian farming

families who still reside in villages in India. They have two children--a son born in India and a daughter born in the United States. Although Mr. Ambati resides with his son in the United States, his wife and daughter reside in India. Mr. Ambati's parents and all six of his brothers and sisters live in India in close proximity to one another. Mr. Ambati supports his parents and siblings from his earnings in the United States.

## A. Mr. Ambati's Testimony before the Immigration Judge

Mr. Ambati completed both high school and college in India. He first arrived in the United States on a nonimmigrant student visa in 1974. He received a master's degree from Oklahoma State University and, in 1977, he returned to India.

Mr. Ambati remained in India until 1991. He lived and worked in Nagpur, a city located 200 miles from his native village where his parents still reside and operate a family farm. While in Nagpur, Mr. Ambati worked as an environmental scientist for the Indian government from 1977 to 1991. During this period, he experienced no difficulties in Nagpur as a result of being Christian and was able to attend church without "physical handling" by those "hostile" to Christians. R.114. However, he was afraid of physical harm during his monthly visits to his parents in their village.

Although Mr. Ambati confirmed that his parents still regularly attended church in their village, he stated that his family had been subject to "religious attacks" for the last ten years. R.115. Mr. Ambati explained that, as Christians, his family was neither liked nor accepted by their neighbors. In fact, on several unspecified occasions, his father and his brothers were attacked and beaten at night while returning from the fields. In addition, Hindu farm workers would steal from Mr. Ambati's father's farm and would prevent other Hindus from working there.

In 1991, Mr. Ambati again entered the United States on a nonimmigrant student visa, this time to pursue a doctorate degree at the Illinois Institute of Technology in Chicago. He explained that becoming a student was the only

opportunity for him to leave a country he "very much wanted to . . . leave." R.120. Soon after he arrived in Chicago, he experienced serious financial difficulties that caused him to leave school and eventually move with his wife and two children to New York City to work. Shortly after arriving in New York in 1992, he, his wife, and his son applied for asylum/1 because they were alarmed by news from Mr. Ambati's parents that they were having difficulty with their crops and that Mr. Ambati's father had been attacked and beaten one night while returning home from the fields.

B.   Administrative Proceedings
1.

   With the help of an attorney, Mr. Ambati filed a request for asylum in September 1992 and included his wife and Pranaykumar in his application. He alleged that, as Christians, he and his family had suffered persecution by Hindus. Responding to an order to show cause, Mr. Ambati appeared at a deportation hearing in October 1996 without an attorney. The Immigration Judge explained in detail the purpose of the hearing as well as Mr. Ambati's rights in the proceedings. The IJ then asked if the Ambatis planned to retain counsel to represent them. When Mr. Ambati replied that they did, the IJ continued the hearing until May 19, 1997. The IJ warned Mr. Ambati, however, that he would grant no further continuances and urged Mr. Ambati to tell his counsel that his hearing date would not be extended.

   Mr. Ambati retained counsel two weeks before his scheduled hearing and informed her that he previously had retained an attorney in New York in 1992 to assist him in filing his application for asylum. On May 19, Mr. Ambati and Pranaykumar appeared at the scheduled hearing, and their newly retained counsel requested a continuance. Counsel explained that she had overestimated the New York attorney's degree of involvement in the Ambatis' case; the case had not been prepared for the hearing, as she had believed, and thus she did not feel prepared to go forward. The IJ suggested to counsel that she could withdraw her notice of appearance and Mr. Ambati could proceed pro se. The IJ stated he would go forward

with the hearing because not only had he granted Mr. Ambati a seven-month continuance, but also had explained clearly that no further continuances would be given. When asked by the IJ if he wanted the attorney to represent him, Mr. Ambati stated that he did. During the course of the hearing, the IJ specifically asked Mr. Ambati whether he would leave the United States if ordered to do so. Mr. Ambati replied, "I beg your Honor to help me to live here . . . because of the serious problem which we are facing."/2 R.137-38.

After considering the evidence,/3 the IJ concluded that Mr. Ambati's request for asylum fell short of establishing either past persecution or a well-founded fear of future persecution. The IJ determined that there was no basis to find that Mr. Ambati suffered past persecution because Mr. Ambati freely practiced his religion, worked in a government position, and was never tortured, detained, or threatened on account of his Christian faith. Moreover, the IJ reasoned, the economic and physical hardships experienced by Mr. Ambati's father and brothers did not support Mr. Ambati's claim for asylum. Lastly, the IJ opined that Mr. Ambati's application for asylum was nothing more than a mechanism to prolong his stay in the United States. Consequently, the IJ denied Mr. Ambati both asylum and withholding of deportation and ordered him deported to India. The IJ refused to allow Mr. Ambati voluntary departure because he found that Mr. Ambati desired to remain in the United States "at all costs." R.71 (internal quotation marks omitted). As for Pranaykumar, the judge also denied him both asylum and withholding of deportation, but granted him voluntary departure. Finally, the judge terminated the proceedings regarding Mrs. Ambati because she had left the United States before the initial deportation hearing.

2.

On appeal, the BIA affirmed the IJ's decision and adopted his findings and conclusions insofar as they regarded Mr. Ambati. In addition, the Board found that, because Mr. Ambati was allowed sufficient time to secure an attorney and prepare his case after the first

continuance had been granted, the IJ did not abuse his discretion when he refused to grant Mr. Ambati another continuance. The BIA reasoned that Mr. Ambati received due process because he was on notice that the IJ was unwilling to grant furthercontinuances and that Mr. Ambati was able to fully and fairly present his case. Lastly, the BIA determined that Pranaykumar's appeal was untimely because it had been filed well beyond the filing deadline of 30 days after the IJ's decision. Mr. Ambati now seeks review of the BIA's decision.

II
ANALYSIS

Mr. Ambati argues that the BIA erroneously concluded that his experiences in India, and those of his family members, did not amount to persecution./4 In addition, he contends that the BIA erred in upholding the IJ's decision in light of his due process challenge. The IJ's refusal to grant a continuance, Mr. Ambati reasons, deprived him of his right to counsel and his right to present fully his case. Finally, Mr. Ambati challenges the BIA's unwillingness both to overturn the IJ's denial of voluntary departure for him and to consider the merits of Pranaykumar's appeal. We address each of these contentions in turn.

A. Persecution

Mr. Ambati contends that the BIA erred in denying him asylum because the evidence established not only that Mr. Ambati and his family were harassed and abused, but also that the livelihood of Mr. Ambati's parents was impaired on account of the family's Christianity. We review the BIA's asylum determination under the substantial evidence test. See Petrovic v. INS, 198 F.3d 1034, 1037 (7th Cir. 2000) (quoting Sivaainkaran v. INS, 972 F.2d 161, 163 (7th Cir. 1992)). We shall disturb the BIA's findings "only if the record lacks substantial evidence to support its factual conclusions." Malek v. INS, 198 F.3d 1016, 1021 (7th Cir. 2000).

To be considered for asylum, Mr. Ambati was required to demonstrate that he qualifies as a refugee. Congress has given the Attorney General discretion to

grant asylum if an applicant qualifies as a refugee under 8 U.S.C. sec. 1101(a)(42)(A). See 8 U.S.C. sec. 1158(b)(1);/5 see also Kaczmarczyk v. INS, 933 F.2d 588, 593 (7th Cir. 1991). The Immigration and Nationality Act defines "refugee" as

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group or political opinion . . . .

8 U.S.C. sec. 1101(a)(42)(A).

Therefore, to prove that he is a refugee within the meaning of the statute, Mr. Ambati must come forward with evidence either of a well-founded fear of future persecution or of past persecution. See Marquez v. INS, 105 F.3d 374, 378 (7th Cir. 1997). If an alien establishes past persecution, there is a rebuttable presumption that he also has a well-founded fear of future persecution and therefore should be granted asylum. See 8 C.F.R. sec. 208(b); see also Asani v. INS, 154 F.3d 719, 722 (7th Cir. 1998). Mr. Ambati bases his asylum claims on both past persecution and a well-founded fear of future persecution. We turn first to Mr. Ambati's claims of past persecution.

1.

This court has described persecution as "punishment or infliction of harm for political, religious, or other reasons." Tamas-Mercea v. Reno, 222 F.3d 417, 424 (7th Cir. 2000) (internal quotation marks and citations omitted). Although the term "persecution" includes actions less severe than threats to life or freedom, "actions must rise above the level of mere harassment to constitute persecution." Id. (internal quotation marks and citations omitted). Mr. Ambati contends that he established past persecution through his testimony about the loss of his family's economic livelihood due to physical attacks, thievery, and economic sabotage by Hindu neighbors. Mr. Ambati, however,

identified no injury to himself, to his wife, or to his children. Indeed, while in India, Mr. Ambati was employed steadily in a government job and regularly attended church. He offered no evidence of any adverse job actions against him, nor evidence of any physical attacks upon him resulting from his religious beliefs. Indeed, Mr. Ambati's derivative persecution claims are indistinguishable from those we rejected in Tamas-Mercea and Bereza v. INS, 115 F.3d 468 (7th Cir. 1997)./6

2.

Mr. Ambati also has failed to establish that the BIA's determination with respect to fear of future persecution is unsupported by the record. "In order to be granted asylum on the basis of future persecution, Mr. [Ambati] must have a 'well-founded' fear of persecution." Tamas-Mercea, 222 F.3d at 426. To have a well-founded fear of persecution, "an applicant must show both that he genuinely fears being persecuted and that his fear is objectively reasonable." Bereza, 115 F.3d at 472 (citations omitted); see also Sofinet v. INS, 196 F.3d 742, 746 (7th Cir. 1999). In support of his claim of future persecution, Mr. Ambati details the same events and actions that he put forward to support his claim of past persecution: the attacks on his family members and the loss of the family's livelihood. However, as set forth above, Mr. Ambati historically has not been the target of such attacks, and he has not come forward with evidence that circumstances have changed in India such that he now will be at risk. Furthermore, Mr. Ambati's wife and daughter voluntarily returned to India nearly five years ago and have remained there since without incident. The absence of evidence of harm to Mr. Ambati's immediate family undermines his claim of a well-founded fear of persecution. See Bhatt v. Reno, 172 F.3d 978, 982 (7th Cir. 1999) (citing Lwin v. INS, 144 F.3d 505, 509 (7th Cir. 1998)). Consequently, Mr. Ambati has not come forward with evidence that his fears are "objectively reasonable."/7

In addition, the record suggests that Mr. Ambati's unwillingness to return to India stems, at least in part, from his fear of a diminished earning capacity, rather than a fear of physical danger to

himself or to his family. Indeed, Mr. Ambati acknowledges that he "sought the refuge of safety and better opportunities to support his extended family by coming to the United States." Petitioner's Br. at 5. However, a diminished earning capacity, standing alone, cannot support a grant of asylum. See Borca, 77 F.3d at 216 (stating that economic harm rises to the level of persecution only if economic disadvantage is both substantial and deliberately imposed on account of person's affiliation with particular group or set of beliefs).

In sum, the record supports the BIA's conclusion that Mr. Ambati failed to establish past persecution or a well-founded fear of future persecution on the basis of religion. Mr. Ambati's chief evidence of persecution concerns his family members, not himself. Furthermore, Mr. Ambati's stress and frustration over his family's economic situation and the antagonism they experience in their relations with their Hindu neighbors do not rise to the level of persecution for purposes of the statute. See Skalak v. INS, 944 F.2d 364, 364-65 (7th Cir. 1991) ("mild harassment" by itself does not constitute persecution). Consequently, we will not disturb the BIA's asylum determination.

B.  Lack of Due Process

Mr. Ambati also argues that the BIA erred in upholding the IJ's decision not to grant him a second continuance. He contends that the IJ's ruling violated his due process rights because the ruling prevented his counsel from fully presenting his claims. By not allowing his newly hired counsel additional time to prepare his case, Mr. Ambati continues, the IJ placed his counsel "in the position of a passenger on a runaway bus, helplessly watching [the IJ] shred her client" on various issues explored during the hearing. Petitioner's Br. at 12.

Deportation hearings are civil proceedings, and asylum-seekers, therefore, have no Sixth Amendment right to counsel. See Mojsilovic v. INS, 156 F.3d 743, 748 (7th Cir. 1998). They are entitled, however, to protection of their due process rights. The Fifth Amendment's due process clause mandates that the

deportation hearing be fundamentally fair. See Castaneda-Suarez v. INS, 993 F.2d 142, 144 (7th Cir. 1993). Specifically, the alien should be afforded the following opportunities: to exercise his right to counsel of his choice at his own expense, see 8 U.S.C. sec. 1362; Batanic v. INS, 12 F.3d 662, 667 (7th Cir. 1993); to reasonably present his evidence, see Castillo-Perez v. INS, 212 F.3d 518, 526 (9th Cir. 2000); and to testify, see Mojsilovic, 156 F.3d at 749. To prevail on a due process claim, a petitioner must produce "concrete evidence" indicating that the due process violation "had the potential for affecting" the outcome of the hearing. Kuciemba v. INS, 92 F.3d 496, 501 (7th Cir. 1996) (internal quotation marks and citations omitted).

The record suggests that Mr. Ambati was allowed a reasonable opportunity to fully and fairly present his case and, therefore, that he was not denied due process. First, Mr. Ambati retained counsel, offered evidence, and testified, answering questions posed by his counsel, by the IJ, and by opposing counsel. See Jacinto v. INS, 208 F.3d 725, 728-29, 731-32 (9th Cir. 2000) (suggesting that questioning of alien by the IJ and by attorneys from both sides along with opportunity for alien to present "affirmative testimony" amounts to a reasonable opportunity for alien to present her evidence). Second, the IJ clearly explained to Mr. Ambati his rights in the hearing and several times asked questions to clarify and elicit further testimony from him. See Michel v. INS, 206 F.3d 253, 259 (2d Cir. 2000) (finding alien not deprived of right to counsel because IJ went "well out of his way" to ensure that alien understood what was occurring in the hearing). Third, Mr. Ambati's hearing had been continued for seven months to allow him time to retain counsel and prepare his case. See Ghajar v. INS, 652 F.2d 1347, 1348-49 (9th Cir. 1991) (finding petitioner had sufficient time to prepare and upholding denial of further continuance even though attorney was hired only a few days before the end of a one-month continuance)./8 Finally, Mr. Ambati offers no evidence that the outcome of the hearing would have been different had he obtained a continuance. He has not set forth any evidence that would have been presented or arguments

that would have been made had his counsel been given additional time to prepare his case. Consequently, assuming a due process violation occurred, Mr. Ambati has not come forward with evidence that the violation affected the outcome of the hearing.

C. Denial of Voluntary Departure

Mr. Ambati next argues that the IJ wrongly denied him voluntary departure and that the BIA erred by not correcting this "arbitrary and capricious" decision. As noted by the BIA and confirmed by our review of the record, however, Mr. Ambati never appealed the denial of voluntary departure to the BIA. Thus, he has waived this argument by failing to present it first to the BIA. See, e.g., Mojsilovic, 156 F.3d at 748 (stating that the court lacks jurisdiction to consider issues not first presented to the BIA).

D. Timeliness of Appeal

Finally, Mr. Ambati argues that the BIA erred when it dismissed Pranaykumar's appeal as untimely. He notes that the BIA plainly considered arguments raised by Pranaykumar's appeal when it decided Mr. Ambati's case. Although it is unclear why the BIA chose to acknowledge Pranaykumar's arguments in deciding Mr. Ambati's appeal, Pranaykumar's appeal was clearly untimely. His appeal was filed on August 4, 1997, nearly two months after the June 18, 1997 deadline for filing. See 8 C.F.R. sec. 3.38(b), (c) (2000). The Ambatis do not challenge the accuracy of these dates, and, consequently, we see no basis for reversing the BIA's decision.

Conclusion

For the foregoing reasons, the Ambatis' petition for review is denied, and the BIA's decision is affirmed.

AFFIRMED

/1 The Ambatis' daughter is a United States citizen; she was born several months after Mr. Ambati began studying in Chicago.

/2 Mr. Ambati did not specify the problem to which he referred.

/3 Apart from his own testimony and the statements in the Ambatis' applications, Mr. Ambati submitted some documentary evidence: 1) two articles--a 1991 article from a Bombay newspaper reporting recent attacks on Christians by "toughs" due to a dispute over water, R.41, and an undated article from an unspecified source reporting an effort by a Hindu organization to bring Christians who were formerly Hindus back into the Hindu fold, R.40; and 2) an April 1996 affidavit from Mr. Ambati's father confirming attacks on family members and property, in which he stated that "Hindu families bore community feelings against the Christian families[,]" "our living here has become most miserable[,]" and that, because "our family is being harassed at our village[,] it would be better if the case is considered sympathetically for a green card." R.158-60. The INS submitted two documents from the United States Department of State: 1) a May 1997 advisory opinion noting both that there were no "serious outbreaks of anti-Christian violence in recent years" and that Christians "have a high level of acceptance in Indian society," R.153; and 2) a report on human rights practices in India for 1995 containing no mention of anti-Christian activities, R.145-51.

/4 Pranaykumar's application for asylum is derivative of his father's; the outcome of Mr. Ambati's case determines the result of Pranaykumar's case. See 8 U.S.C. sec. 158(b)(3) (2000); 8 C.F.R. sec. 207.7(a) (2000). Consequently, we address the substantive claims made in this appeal in terms of how they relate to Mr. Ambati. The timeliness of Pranaykumar's appeal, however, is addressed after the common, substantive issues.

/5 8 U.S.C. sec. 1158(b)(1) states: "The Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Attorney General under this section if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title."

/6 In those cases, sons of parents who had suffered persecution under former communist regimes argued that they should be granted asylum based on the persecution of their family members. We declined to recognize the derivative claims in those circumstances as meriting asylum. In Tamas-Mercea, for example, we stated:

If Mr. Tamas personally had suffered the type of harm inflicted on his family members, we would have little trouble concluding that he had suffered persecution within the meaning of the

statute. Mr. Tamas testified that his father, grandfather, and uncle were arrested and beaten for opposing collectivization. As well, his father was beaten in 1991, when he attempted to recover his family property. However, Mr. Tamas does not argue that he was subjected to this type of treatment. He, instead, claims a type of derivative persecution, that which arose from the physical abuse of his family members and the discrimination he personally endured because of his family's opposition to the communist regime.

. . .

Here, as in Bereza, it was Mr. Tamas' family members who suffered persecution as a result of their political beliefs. Although Mr. Tamas did suffer some economic harm and personal humiliation as a result of his family's activities, the circumstances here are not sufficient to establish his persecution for purposes of the statute.

Tamas-Mercea, 222 F.3d at 424.

/7 Because we find that Mr. Ambati's fears are not objectively reasonable, we need not reach the issue of whether Mr. Ambati's fears are genuine.

/8 Mr. Ambati gave no reason why he was unable to retain counsel until two weeks before his hearing date.