NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 12, 2007
Decided January 28, 2008

**Before**

Hon. WILLIAM J. BAUER, *Circuit Judge*

Hon. DANIEL A. MANION, *Circuit Judge*

Hon. ILANA DIAMOND ROVNER, *Circuit Judge*

No. 07-1317

| | |
|---|---|
| SHIJUN LIU,<br>    *Petitioner,* | Petition for Review of an Order of the<br>Board of Immigration Appeals |
|     *v.* | No. A79-544-361 |
| MICHAEL B. MUKASEY, Attorney<br>General of the United States,<br>    *Respondent.* | |

**O R D E R**

Shijun Liu applied for asylum, withholding of removal, and protection under the Convention against Torture ("CAT") based on religious persecution he claims to have suffered as a Tibetan Buddhist in the People's Republic of China. The IJ discredited his testimony based on purported inconsistencies in the record. The BIA affirmed, and Liu now petitions for review. We grant Liu's petition for review because substantial evidence does not support the adverse credibility finding, past persecution determination, or the finding that Liu would not suffer future persecution.

In April 2001, after overstaying his visa, Shijun Liu applied for asylum, withholding of removal, and relief under the CAT based on his claim of fear of persecution on account of his religion. In his application Liu explained that he converted to Tibetan Buddhism after being treated by a doctor for altitude sickness on a business trip to Tibet. After returning to his home in China, Liu continued to learn more about Tibetan Buddhism and held gatherings in his home where his friends would come to learn about Tibetan Buddhism and worship the Dalai Lama.

In his application Liu contended that in November 2000, while praying silently with a group of fellow worshipers in his home, police broke in and ordered the gathered individuals to the police station. The police confiscated a videotape from Tibet and other religious materials, including a statue of the Buddha. As Liu tried to protect the statue, police beat him with an electric baton until he fell down, and then they forcibly took him to the police station. At the police station, he was questioned about his "illegal gatherings," dealings with foreigners, worship of the Dalai Lama, and his support of Tibetan independence. He said police officers kicked him and beat him severely, threatening that he deserved "to be beaten to death," and forcing him to stay in a squatting position until he "confessed." Police then removed him to a wet and dirty cell for two weeks until a friend paid for his release. Upon Liu's release, his employer, the Dalian Tractor Factory, notified him that he was laid off, and in February 2001, Liu fled to America on the advice of his family. Liu concluded his application by stating that he had recently contacted his family in China and they informed him that a letter from the Dalian Tractor Factory arrived that officially fired him. His family further warned that the police continued to visit their family home searching for Liu. He stated that he feared returning to China because he would "be attacked" and lose his freedom.

Prior to Liu's asylum hearing in June 2006, both parties supplemented the record with additional evidence. Liu submitted two medical records, dated November 29, 2000, and December 6, 2000, which recorded Liu's diagnosis of a cerebral concussion with wounds on his back and chest that suggest he had been hit with a blunt object approximately a half a month prior to the visit. Both records concluded with the statement, as translated: "Hospitalization recommended." He also submitted a letter from his employer accusing him of spreading Tibetan independence "illegally and widely" and organizing illegal gatherings. The letter bore the Dalian Tractor Factory stamp and stated that Liu was officially fired. Liu also submitted pictures of himself and fellow Tibetan Buddhists in America.

The government supplemented the record with the 2005 International Religious Freedom Report and Reports on Human Rights Practices from the Department of State. These reports found that Tibetan Buddhism is not freely practiced in China and that practitioners "were subject to government pressure and sometimes suffered abuse." Furthermore, the reports indicated that arbitrary arrest and detention of

Tibetan Buddhists practicing their religion remained a serious problem. The government also submitted a copy of Liu's passport, which showed an issue date of November 23, 2000.

At the hearing Liu testified consistently with his asylum application. He clarified that, following his detention, he was not formally charged with any crime but was required to go to the police station every week where the police would detain him. He further testified that after he was released from police detention, he went to the doctor and was hospitalized due to the extent of his injuries.

On cross-examination the government attorney questioned Liu regarding the supplemental documentation he provided. The government first asked why Liu waited nearly four years to submit the documents. Liu testified that he was unable to get the documents sooner because his family feared that Chinese government censors would discover them if they were mailed, and therefore he was forced to wait until a friend could bring them to America. Additionally, the government attorney pointed out that Liu testified that he was fired immediately after he was released from detention, but the letter from his employer officially firing him allegedly arrived almost three months after his release. To this, Liu explained that he was told immediately after his detention not to return to work and the letter represented the formal notification. The government attorney also questioned Liu regarding his alleged hospitalization, to which Liu consistently responded that he had been hospitalized on November 29, 2000, for one week and was released on December 6, 2000.

Finally, the government attorney cross-examined Liu regarding the date his passport was issued. According to Liu, he applied for his passport after his detention, which ended on November 29, 2000. When asked by the government attorney how this was possible, since his passport was dated November 23, 2000, Liu responded that he did not obtain the passport himself; rather he paid a friend 100,000 RMB[1] to fill out the application and obtain the passport for him. Liu continued via the translator: "I don't know why there was a discrepancy on the date but I paid a friend or paid a person to obtain the passport for me. I did not physically get the passport in my hands until January when I signed the passport."

The IJ denied Liu's request for asylum, withholding of removal, and relief under the CAT. The IJ found that Liu's account lacked credibility, identifying inconsistencies

---

[1] Based on the conversion rate in November 2000, this would have been approximately $12,080 in American currency. *See* International Monetary Fund, http://www.imf.org/external/np/fin/data/rms_mth.aspx?SelectDate=2000-11-30&reportType=REP (last visited Jan. 18, 2008).

in Liu's story. First, the IJ noted that Liu did not mention his week-long hospitalization in his original asylum application, nor did he present hospital records until nearly four years later. Second, the IJ questioned the validity of the records based on the unlikelihood that a doctor would include a notation of "hospitalization recommended" if the patient had already been hospitalized. Third, the IJ found inconsistent Liu's testimony that he was fired immediately following his detention and his later assertion that the termination was not "official" until he received the letter three months later. Finally, the IJ reasoned that inconsistences about when Liu received his passport called "into doubt his entire story." The IJ also found that Liu's petition could alternatively be denied because he had failed to establish past persecution or submit evidence of his fear of future persecution. The IJ also reasoned that because Liu had failed to establish eligibility for asylum, he also failed to meet the higher standard required for withholding of removal or relief under the CAT.

Liu appealed to the Board of Immigration Appeals. In his brief to the BIA, Liu argued that the IJ's findings were not supported by substantial evidence. The BIA affirmed the IJ's adverse credibility determination. In a one-paragraph decision, the BIA agreed with the IJ that the following inconsistences established that Liu's testimony was not credible: (1) Liu's failure to mention his hospitalization in his original application, (2) discrepancies in Liu's testimony regarding his one-week hospitalization, (3) varying testimony regarding when Liu was fired from his work unit, and (4) discrepancies between the date Liu decided to leave China and the issuance date on his passport during the time of his detention.

In his petition for review, Liu first argues that the BIA's review of the IJ's decision violated his due process rights, but this argument lacks merit. Liu argues generally that the BIA ignored relevant evidence, but never points to any specific evidence that the BIA ignored. We have held that even a summary affirmance by the BIA does not violate an alien's due process right to review. *See Qureshi v. Gonzales*, 442 F.3d 985, 991 (7th Cir. 2006). Additionally, when analyzing claims of due process regarding removal hearings, we have required aliens to show prejudice to prevail. *See Bejko v. Gonzales*, 468 F.3d 482, 487 (7th Cir. 2006); *Feto v. Gonzales*, 433 F.3d 907, 912 (7th Cir. 2006). The BIA's decision in this case included decidedly more analysis than a summary affirmance, and Liu points to no evidence that the BIA ignored that might have changed its decision. Therefore, Liu has failed to establish a due process violation.

Liu also argues that the BIA's adverse credibility determination is not supported by substantial evidence. Where, as here, the BIA does not expressly adopt the IJ's findings but rather agrees with and approves the IJ's reasoning that led to the credibility finding, we review the BIA's decision alone. *See Moab v. Gonzales* 500 F.3d 656, 659 (7th Cir. 2007). We review credibility determinations deferentially and will uphold them unless the record compels a different conclusion. *See Tarraf v. Gonzales*,

495 F.3d 525, 532 (7th Cir. 2007). In situations such as this, however, where an adverse credibility finding is based entirely on inconsistencies with the documentary evidence and not on the demeanor of the witness, "the reviewing court is in a better position to decide whether the credibility determination was reasonable." *See Kadia v. Gonzales*, 501 F.3d 817, 820 (7th Cir. 2007). Because Liu petitioned for asylum in 2001, his case is not affected by the revised credibility standards of the REAL ID Act of 2005, which went into effect on May 11, 2005. *See* 8 U.S.C. § 1158(b)(1)(B)(iii); *Diallo v. Gonzales*, 439 F.3d 764, 766 n.l (7th Cir. 2006).

The BIA identified four inconsistencies that led to its approval of the IJ's adverse credibility finding. But all four are inadequate to support the IJ's determination. The first issue identified by the BIA is Liu's omission of his hospitalization from his original asylum application, but that does not render his testimony per se incredible. We have held that an asylum application need not be complete and may be supplemented by testimony to add details or to explain any inconsistencies. *See Tarraf*, 495 F.3d at 532; *Kllokoqi v. Gonzales*, 439 F.3d 336, 342 (7th Cir. 2005). In his original application, Liu detailed the extent of his injuries and at his hearing he added that the injuries resulted in hospitalization. This is not a situation where Liu told one story in his application and a different story during his hearing. *Cf. Singh v. Gonzales*, 487 F.3d 1056, 1060 (7th Cir. 2007). Therefore, it was unreasonable for the IJ to base his adverse credibility determination on this factor.

Likewise, the BIA erroneously discredited the medical records based on their notation, "hospitalization recommended." The BIA assumed that if a person had already been hospitalized, medical records releasing the patient would not include a *recommendation* of hospitalization. But nothing in the record confirms this assumption. *See Jiang v. Gonzales*, 485 F.3d 992, 996 (7th Cir. 2007) (holding that IJ improperly discounted medical records "based on his own assumptions regarding what information is included in Chinese hospital documents"). And we have held that credibility determinations may not be based on "perceived common knowledge" as opposed to record evidence. *See Huang v. Gonzales*, 403 F.3d 945, 949-50 (7th Cir. 2005). There are many reasons why a patient would leave a hospital against the recommendation of further hospitalization, and the government never asked Liu why he left. Additionally, the BIA failed to consider the potential hazards of translation, making the BIA's heavy reliance on this factor even less reasonable. *See Jiang*, 485 F.3d at 996 (noting that tone in hospital records that was unfamiliar to an American IJ could be the product of poor translation).

The BIA's third basis for affirming the IJ's adverse credibility finding—inconsistencies in Liu's testimony regarding when he was fired—is also unavailing. Liu explained that although he was told not to return to work following his release from detention, this decision was not permanent until he received the letter from the Dalian Tractor Factory. Where inconsistences in testimony are easily

explained, they are insufficient to form the basis of an adverse credibility finding. *See Giday v. Gonzales*, 434 F.3d 543, 551 (7th Cir. 2006). Here, Liu's explanation is both plausible and sufficient to render this inconsistency inconsequential. What's more, this purported inconsistency cannot be used to make an adverse credibility finding because it does not go to the heart of Liu's asylum claim for the timing of Liu's termination is immaterial to the credibility of his claim of religious persecution. *See Adekpe v. Gonzales*, 480 F.3d 525, 531 (7th Cir. 2007).

The BIA's final reason for affirming the IJ's adverse credibility determination related to the inconsistency between Liu's testimony that he applied for a passport after his release from detention and the date on the passport itself, which showed that it was issued during his alleged detention. In a case very similar to this one, a Chinese asylum-seeker presented a fraudulent passport that was purportedly issued during the time the applicant was detained. *Jiang*, 485 F.3d at 996. We held that, in such a situation, it was impermissible for the IJ to overlook the applicant's explanation that the issuance date was likely incorrect because the passport was forged. *Id*.

At the hearing in this case, Liu responded "yes" to the IJ's question regarding whether he had a valid passport. However, Liu also repeatedly explained that he did not procure the passport himself, but rather had paid a friend the equivalent of $12,080 to procure it for him. This suggests that the passport was not obtained through the proper legal channels and would explain the discrepancy in the date. As in *Jiang*, the BIA inappropriately overlooked Liu's explanation for the date discrepancy. There is an unfortunate dearth of information available related to both what constitutes a valid Chinese passport and the appropriate weight that should be given to this type of evidence. One fairly recent opinion noted that Chinese citizens wishing to leave the country must obtain a passport and an exit permit, *see Lian v. Ashcroft*, 379 F.3d 457, 460 (7th Cir. 2004), but there is no evidence that Liu had an exit permit.

Whether the BIA properly discredited Liu's testimony on the passport issue is extremely close. On the one hand there is Liu's one-word affirmative answer that the passport was valid, but on the other hand is considerable evidence that the passport was procured though a bribe. However, we need not decide the issue because even if the BIA reasonably concluded that the passport was valid, this single inconsistency is insufficient to support the BIA's adverse credibility determination. *See Dong v. Gonzales*, 421 F.3d 573, 579 (7th Cir. 2005) (concluding that inconsistent statements can be valid reasons for discrediting alien, but alone are too weak to save the IJ's otherwise undermined adverse credibility finding); *Georgis v. Ashcroft*, 328 F.3d 962, 970 (7th Cir. 2003) (refusing to defer to the IJ's adverse credibility determination where five out of six of the IJ's reasons were unsupported). Three of the BIA's four asserted reasons for discrediting Liu's testimony of persecution have been firmly undermined, and the fourth reason is a weak inconsistency at best. The evidence,

therefore, is insufficient to support the BIA's conclusion that the IJ's adverse credibility finding was correct.

Although not addressed by the BIA, the IJ listed two alternative grounds to deny Liu's applications—that Liu's testimony, even if credited, did not establish that he suffered past persecution or that he had a well-founded fear of future persecution. We have defined persecution as "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *See Boci v. Gonzales*, 473 F.3d 762*,* 766 (7th Cir. 2007) (citation and quotations omitted). We have held that "detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation, of property, surveillance, beatings, or torture may be sufficient to establish persecution," but the harm must rise above "mere harassment." *See Soumahoro v. Gonzales*, 415 F.3d 732, 737 (7th Cir. 2005) (citation and internal quotation marks omitted).

Here the IJ stated that it did not believe that Liu's "one detention, even if true, rises to the level of severity enough to constitute past persecution." This assessment was in error. The IJ failed to fully address the mistreatment that Liu suffered as a whole, as we have held the IJ is required to do. *See BinRashed v. Gonzales*, 502 F.3d 666*,* 671 (7th Cir. 2007). Liu testified that the police illegally entered his home, confiscated and broke religious objects, beat him when he tried to protect those objects, took him to the police station where he was again beaten repeatedly with an electric baton, slammed his head against the wall, and limited his freedom by requiring him to check-in weekly with the police. *See Jiang*, 485 F.3d at 997 (holding alien suffered past persecution where police beat him, illegally searched his home, confiscated religious items, prohibited him from attending church, and required him to check in weekly). As a result of these beatings Liu suffered a concussion and was hospitalized for a week. Finally, according to Liu, after being released from detention he was no longer allowed to gather with fellow Tibetan Buddhists or practice his religion freely. Considered as a whole, this is sufficient to constitute past persecution. *See, e.g.*, *Tchemkou v. Gonzales*, 495 F.3d 785, 793 (7th Cir. 2007) (holding that two beatings resulting in hospitalizations constituted past persecution); *Kantoni v. Gonzales*, 461 F.3d 894, 898 (7th Cir. 2006) (holding that "credible threat that causes a person to abandon lawful political or religious associations or beliefs is persecution"); *Capric v. Ashcroft*, 355 F.3d 1075, 1084 (7th Cir. 2004) (concluding that persecution can include "confiscation of property, surveillance, beatings, torture, [and] behavior that threatens the same.") (citations and quotations omitted).

The IJ also determined that Liu failed to establish a reasonable fear of future persecution. This conclusion is incorrect because it is premised upon the notion that Liu did not suffer past persecution. Where an asylum applicant has shown that he suffered past persecution, a rebuttable presumption of future persecution arises. *See Gomes v. Gonzales*, 473 F.3d 746, 753 (7th Cir. 2007). Therefore, the IJ erred when it

stated that Liu bore the burden of establishing future persecution. Additionally, the IJ erroneously stated that nothing in the background reports on China suggested that Liu had a reasonable fear of future persecution. However, as previously noted, the State Department reports repeatedly discuss China's persecution of Tibetan Buddhists. This, combined with the fact that Liu testified that the police had visited his family searching for him, suggests that Liu has a reasonable fear of future persecution. *See e.g.*, *BinRashed*, 502 F.3d at 672-73 (finding that where applicant was wanted by police and State Department reports corroborated allegations of persecution, case should be remanded to IJ for further findings).

Accordingly, we GRANT Liu's petition for review.